UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LLOYD HARDIN McNEIL,<br><br>                    Petitioner,<br><br>   v.<br><br>JOSH TEWALT, Director, Idaho<br>Department of Correction,<br><br>                Respondent. | Case No. 1:19-cv-00406-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is a Petition for Writ of Habeas Corpus filed by Idaho prisoner Lloyd Hardin McNeil. McNeil challenges his Ada County convictions of voluntary manslaughter, first-degree arson, and grand theft. *See* Dkt. 3, 14. The Court previously dismissed Claims B(1) through B(8), Claim B(12), and Claim D as procedurally defaulted. *See* Dkt. 50. The Court noted that Claims A(2) and A(3) also appeared to be procedurally defaulted but reserved ruling on that issue.

Respondent now asks for dismissal of Claims A(2) and A(3), as well as portions of Claim C, as procedurally defaulted. In addition, the merits of the remaining claims in the Petition are fully briefed and ripe for adjudication.

The Court takes judicial notice of the records from McNeil's state court proceedings. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1 (9th Cir. 2006). Having carefully reviewed the record in this matter, including the state court record, the Court concludes that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d).

For the reasons explained below, the Court enters the following Order denying habeas corpus relief.

## BACKGROUND

The following facts of McNeil's case, as described by the Idaho Court of Appeals, are presumed correct absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1). "On March 5, 2011, firefighters responded to a residential fire in a Boise neighborhood. The firefighters determined that the fire was confined to a mattress and box spring located in a bedroom." *State v. McNeil*, 313 P.3d 48, 51 (Idaho Ct. App. 2013).

The firefighters removed the mattress and "found the body of Natalie Davis lying on top of the box spring." *Id*. The fire investigation, which included "reconstructed tests of the scenario," revealed that "the fire was intentional and human caused." *Id*.

Police officers began investigating Davis's death and discovered that her car and her two dogs were missing. Later, the dogs were found at a "no kill" shelter in

Dillon, Montana. *Id*. Petitioner McNeil, Davis's former boyfriend, was positively identified as the person who had dropped the dogs off at the shelter. The investigation also revealed that McNeil had convinced a woman named Amanda Pluard to pawn the victim's antique ring. *Id*. at 52.

McNeil was charged with second-degree murder, arson, and grand theft. Presumably because a corpse lying between a mattress and box spring is highly suspicious of an intentional homicide and arson, rather than an accidental death and fire, McNeil contended that Davis's body had actually been on top of the mattress—not between the mattress and the underlying box spring. This factual dispute was based on an idea that a firefighter missed the body during the initial search and then violently moved the mattress, flipping Davis's body onto the box spring. Both the State and McNeil spent substantial amounts of time in trial on how the burn patterns supported or detracted from the State's theory that Davis was found between the mattress and box spring.

The jury acquitted McNeil of second-degree murder but convicted him of the lesser-included offense of voluntary manslaughter. The jury also found McNeil guilty of arson and grand theft. *Id*. at 51.

McNeil appealed, arguing that there was insufficient evidence to support the manslaughter conviction, that the prosecutor committed misconduct during closing argument, and that the trial court abused its sentencing discretion. *State's Lodging*

*B-1*. The Idaho Court of Appeals affirmed, and the Idaho Supreme Court denied

review. *State's Lodging B-4; B-7*.[1]

McNeil then pursued state post-conviction relief, raising numerous claims of

ineffective assistance of counsel. The state district court denied the petition, and

the Idaho Court of Appeals affirmed. *State's Lodging E-1* at 169–87, 378–383; *F-*

*6*. The state supreme court denied review. *State's Lodging F-9*.

The following claims in McNeil's federal habeas petition remain for

adjudication:

|  |  |
|---|---|
| Claim A: | Insufficient evidence to support (1) the manslaughter conviction, (2) the arson conviction, and (3) the grand theft conviction. |
| Claim B(9): | Ineffective assistance of counsel for failing to request a mistrial after a juror saw McNeil in a police vehicle. |
| Claim B(10): | Ineffective assistance of counsel for failing to request a mistrial after a juror was seen speaking to Davis's uncle. |
| Claim B(11): | Ineffective assistance of counsel for failing to investigate a defense to the grand theft charge, specifically, that Davis had previously tried to pawn the ring McNeil was charged with stealing. |
| Claim C: | Prosecutorial misconduct based on (1) commenting on McNeil's silence, (2) appealing |

---

[1] McNeil later obtained relief on his claim that the trial court erred in overruling his objections to portions of the restitution order, but this is not relevant to McNeil's current habeas claims. *See State's Lodging D-4*.

to the passions and prejudices of the jury, and (3) making misrepresentations and insulting and denigrating defense counsel.

*See* Dkt. 12; Dkt. 14; Dkt. 50 at 4–5.

For the following reasons, the Court concludes that McNeil is not entitled to habeas corpus relief.

## DISCUSSION

**1.    Claims A(2), A(3), and Portions of Claim C(1) and C(3) Must Be Dismissed as Procedurally Defaulted**

The Court previously described the standards of law regarding procedural default and will not repeat them here except as necessary to explain the Court's decision. *See* Dkt. 50 at 6–8. In brief, a petitioner may not obtain relief on a habeas claim in federal court unless he has first properly exhausted that claim by fairly presenting it to the state courts. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Only two exceptions to this rule exist: (1) where a petitioner establishes cause and prejudice for the failure to properly exhaust a claim; or (2) where a petitioner establishes that he is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

### A.    *Claims A(2) and A(3)*

The Court previously explained that A(2) and A(3), which allege insufficient evidence to support McNeil's convictions for arson and grand theft, appeared to be

procedurally defaulted because, in state court, McNeil raised an insufficient evidence claim only as to his manslaughter conviction. *See* Dkt. 50 at 6 n.1.

McNeil has not convinced the Court to alter its analysis. Because McNeil did not fairly present Claims A(2) and A(3) to the Idaho Supreme Court, they are procedurally defaulted. McNeil has not established an excuse for that default. *See generally* Dkt. 56. Accordingly, the Court must dismiss Claims A(2) and A(3).

### B.     *Portions of Claims C(1) and C(3)*

Respondent also argues that a portion of Claim C(1) and a portion of Claim C(3) are procedurally defaulted. These are claims of prosecutorial misconduct during closing argument and rebuttal closing argument.

Claim C(1) asserts the prosecutor improperly commented on McNeil's decision not to testify. On direct appeal, McNeil challenged the following statements in the prosecutor's closing argument:

> (a) "He put that body between the mattress and the box spring. We know that's a staged scene. You know that's a staged scene. *There has been no testimony other than that*"; and

> (b) "And, of course, we know she was dead before the fire, so the fire didn't kill her, and she had been dead some time before the fire because the lividity had set in, *so there is a small window there nobody can really know except the defendant. He's the only person who lived through it.*

*State's Lodging B-1* at 17 (emphasis added).

But McNeil did not challenge a different statement by the prosecutor, made in rebuttal closing argument, as improperly commenting on McNeil's silence: "[T]here is that narrow window of time where only he and her were there [in the house], and the next thing you know, the house is on fire, and we have got a coincidence that the fire just broke out?" *Id.*; *see State's Lodging A-2* at 1096. Therefore, this portion of Claim C(1) is procedurally defaulted.

Claim C(3) asserts that the prosecutor engaged in misrepresentation and denigrated defense counsel. In state court, McNeil complained of only the following statements by the prosecutor during rebuttal closing argument:

(a) "I guess they concede the grand theft"; and

(b) "We want to hold people accountable when they murder someone, yes, but we don't want it to happen. We don't want to make it up. *And he [defense counsel] has to say that to try to get his client out of trouble.*"

*State's Lodging B-1* at 20–21.

But McNeil did not raise a challenge to the following statement in state court: "These were not—the purpose and design of the test was not to establish soot patterns. That's a whole other area of fire engineering, and some day maybe defense counsel can be a fire engineer and know that, but that's a different purpose." *Id.*; *see State's Lodging A-2* at 1097; Dkt. 54, p. 63, n.12. Therefore, this portion of Claim C(3) is also procedurally defaulted.

McNeil has not established cause and prejudice, or actual innocence, to excuse the procedural default of these portions of Claim C. Therefore, these sub-claims will be dismissed with prejudice.

The Court now turns to the merits of the remaining claims.

## 2.    Standard of Law for Merits Adjudication

A federal court may grant habeas corpus relief if it determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). If the state court has adjudicated a claim on the merits, habeas relief is further limited by § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, federal habeas relief must be denied unless the state court's adjudication of the petitioner's claim:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The term "unreasonable" in § 2254(d) is reserved for "extreme malfunctions in the state criminal justice system," not for "ordinary error" or even for cases

"where the petitioner offers a strong case for relief." *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (per curiam) (internal quotation marks omitted). Accordingly, a federal court reviewing a state court's adjudication of a claim on the merits "must carefully consider all the reasons and evidence supporting the state court's decision." *Id*. Courts are not permitted "to essentially evaluate the merits *de novo* by omitting inconvenient details from its analysis." *Id*. (internal quotation marks and alteration omitted). Instead, "[d]eciding whether a state court's decision involved an unreasonable application of federal law or was based on an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims and to give appropriate deference to that decision." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018) (internal quotation marks and citations omitted).

When a petitioner contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially

indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1), the petitioner must show that the state court—although identifying "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. 415, 426 (2014) (emphasis omitted).

The AEDPA standard is extraordinarily high, and a federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong. Rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Williams*, 529 U.S. at 411. If there is *any* possibility that fair-minded jurists could disagree on the correctness of the state court's decision, § 2254(d) precludes relief. *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013); *Harrington v. Richter*, 562 U.S. 86, 101–02 (2011). In other words, if one fair-minded jurist could agree that the state court's decision is reasonable, habeas relief must be denied—even other fair-minded jurists would disagree.

"Clearly established federal law" means the governing legal principles set forth in the holdings—not the dicta—of the United States Supreme Court, as of the time the state court rendered its decision. *Williams*, 529 U.S. at 412. The habeas statute does not require an *identical* factual pattern before a legal rule must be applied. Rather, state courts must reasonably apply the rules squarely established by the Supreme Court's holdings to the facts of each case. *See White*, 572 U.S. at 427.

On the other hand, if a court must *extend* a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state court's decision. *Id*. at 407. A federal habeas court "may not overrule a state court for … holding a view different from its own" when the precedent from the Supreme Court "is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003). Although circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent, *Duhaime v. Ducharme*, 200 F.3d 597, 600–01 (9th Cir. 2000), a federal court may not use circuit law to refine or sharpen a general principle of Supreme Court habeas corpus jurisprudence into a specific legal rule that the Supreme Court itself has not announced, *Lopez v. Smith*, 574 U.S. 1, 7 (2014).

If no Supreme Court decision has confronted the specific question presented by a state prisoner's federal habeas petition—that is, if the circumstances of a petitioner's case are only generally similar to the Supreme Court's precedents—then the state court's decision cannot be "contrary to" any holding from the Supreme Court. *Woods v. Donald*, 575 U.S. 312, 317 (2015) (per curiam). By the same token, a state court cannot unreasonably apply established Supreme Court precedent that does not exist. *See, e.g., Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). Therefore, if (1) a claim was adjudicated on the merits in state court, and (2) the underlying factual determinations of the state court were not unreasonable, then evidence that was not presented to the state court cannot be introduced on federal habeas review. *See Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014) ("After *Pinholster*, a federal habeas court may consider new evidence only on de novo review, subject to the limitations of § 2254(e)(2).").

To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable ... in light of the evidence presented in the State court proceeding." A "state-court factual determination is not unreasonable merely because the federal habeas court

would have reached a different conclusion in the first instance." *Wood v. Allen*,

558 U.S. 290, 301 (2010); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)

("The question under AEDPA is not whether a federal court believes the state

court's determination was incorrect but whether that determination was

unreasonable—a substantially higher threshold."). Instead, state court factual

findings are presumed to be correct and are binding on the federal court unless the

petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C.

§ 2254(e)(1). "If reasonable minds reviewing the record might disagree about the

finding in question," then the finding is not unreasonable under § 2254(d)(2).

*Pizzuto v. Yordy*, 947 F.3d 510, 530 (9th Cir. 2019) (internal quotation marks and

alterations omitted).

      If a petitioner satisfies § 2254(d)—either by showing that the state court's

adjudication of the claim was contrary to or an unreasonable application of

Supreme Court precedent under subsection (d)(1), or by establishing the state

court's decision was based on an unreasonable factual finding under subsection

(d)(2)—then the federal habeas court must review the petitioner's claim de novo,

meaning without deference to the state court's decision. *Hurles v. Ryan*, 752 F.3d

768, 778 (9th Cir. 2014). When considering a habeas claim de novo, a district court

may, as in the pre-AEDPA era, draw from both United States Supreme Court and

circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489

U.S. 288 (1989), as modified by *Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021).

Even under de novo review, however, if the factual findings of the state

court are not unreasonable under § 2254(d)(2), the Court must apply the

presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by

the state courts. *Pirtle v. Morgan*, 313 F.3d 1160, 1167–68 (9th Cir. 2002);

*Kirkpatrick v. Chappell*, 950 F.3d 1118, 1131 (9th Cir. 2020) ("Unlike § 2254(d), §

2254(e)(1)'s application is not limited to claims adjudicated on the merits [by a

state court]."). Conversely, if a state court factual determination is unreasonable,

the federal court is not limited by § 2254(e)(1) and may consider evidence outside

the state court record, except to the extent that § 2254(e)(2) might apply. *See

Murray*, 745 F.3d at 1000.

Generally, even if a petitioner succeeds in demonstrating a constitutional

error in his conviction, he is entitled to federal habeas relief only if the petitioner

"can establish that [the error] resulted in 'actual prejudice.'" *Brecht v.

Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, an error is not

harmless, and habeas relief must be granted, only if the federal court has "grave

doubt about whether a trial error of federal law had substantial and injurious effect

or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432,

436 (1995) (internal quotation marks omitted). A "reasonable possibility" of prejudice is insufficient. *Brecht*, 507 U.S. at 637.

Additionally, some types of claims "are analyzed under their own harmless error standards, which can render *Brecht* analysis unnecessary." *Jackson v. Brown*, 513 F.3d 1057, 1070 (9th Cir. 2008). Ineffective assistance of counsel claims are included in this category. *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) ("[W]here a habeas petition governed by AEDPA alleges ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), we apply *Strickland*'s prejudice standard and do not engage in a separate analysis applying the *Brecht* standard.").

## 3.    McNeil Is Not Entitled to Habeas Relief on Claim A(1)

Claim A(1) asserts that McNeil's conviction for voluntary manslaughter was not supported by sufficient evidence.

### A.    *Clearly Established Law*

The Fourteenth Amendment prohibits government action that deprives an individual of life, liberty, or property without due process of law. The Due Process Clause guarantees "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979).

When reviewing a sufficiency of the evidence claim, a court must determine "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Id*. at 318. The question is not whether the reviewing court itself believes that the record evidence establishes proof of guilt beyond a reasonable doubt. "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*.

### B.   *The Trial Evidence*

The evidence at trial "depicted the stormy relationship" between Davis and McNeil:

> A Montana detective testified that, approximately eight months prior to her death, Davis went to the Bozeman police station and reported that McNeil struck her with a flashlight, grabbed her, and was verbally abusive. As a result, the State of Montana charged McNeil with felony assault with a weapon and misdemeanor partner or family member assault. McNeil was released on bail and, as a condition of his bail, was ordered to have no contact with Davis. Davis met several times with a victim coordinator, and the coordinator stated that, although Davis did not want anything bad to happen to McNeil, she was willing to testify in the case against him.

*McNeil I*, 313 P.3d at 52.

MEMORANDUM DECISION AND ORDER - 16

Davis later moved to Boise, while McNeil stayed in Montana. About one month before Davis's death, "McNeil boarded a bus to Boise, where he met a Ms. [Amanda] Pluard. He told Pluard about his 'tumultuous' and 'difficult' relationship with Davis, including that he was being charged with a crime and that he had a no contact order." *Id*. McNeil told Pluard that "he was concerned about seeing Davis due to the no contact order, but that he thought there would be repercussions with his pending criminal charges if he did not see her." *Id*. McNeil and Pluard stayed in contact while McNeil was in Boise. Two weeks before Davis's death, "McNeil told Pluard that he would be returning to Montana soon, that he was in possession of an antique ring 'appraised high,' that his 'plan worked,' and that he thought Davis would 'be in jail soon.'" *Id*.

Davis's brother lived with Davis and McNeil and slept in the basement. The day of the murder, he "was awakened at 6:30 a.m. by the sound of McNeil and Davis arguing":

> He then heard "some loud noises, banging, like the sound of stomping feet, or maybe somebody slamming a door repeatedly." The brother noted that the loud noises were "like bang, bang, and then bang, bang." Following the noises, the arguing stopped. Minutes later, the brother's alarm went off and he went upstairs to use the bathroom. He then saw McNeil sitting on a futon and Davis lying on the futon. He further testified that McNeil told him Davis was "sleeping." Later, when the brother left the house for work, he stated that he saw McNeil and Davis "lying down next to each other on the futon," but did not speak to either person.

MEMORANDUM DECISION AND ORDER - 17

*Id*. at 52–53.

During Davis's autopsy, the pathologist discovered "several fresh bruises covering the body, specifically a large bruise on the chest along with bruises on the arms, legs and neck." *Id.* at 53. Davis had alcohol and Benadryl in her system in levels sufficient to sedate her, but not to kill her.

The pathologist could not conclusively determine a cause of death based solely on the results of the autopsy, though it was clear that Davis was dead before the fire started. *Id*. The pathologist testified that "Davis did not die of natural causes" and that her death was, therefore, either accidental or intentional.

Although the pathologist was unable to conclusively determine cause of death, he did opine on the possible scenarios that could have led to Davis's death:

> As to intentional death scenarios, [the pathologist] stated that a person could have killed Davis by placing a hand, pillow or another object over her mouth while she was in her sedated state causing her to suffocate. A person could have also killed Davis by compressing her chest, for example, by sitting on her chest while [she was] sedated. Such manner of death would be intentional and would be supported by the autopsy results.

*Id*. As for potential accidental causes of death,

> the pathologist related that Davis could have suffocated by lying on the floor with her neck against the wall compromising her airway. This type of accidental death would also be supported by the autopsy.

*Id*.

MEMORANDUM DECISION AND ORDER - 18

Notwithstanding the inconclusive nature of the autopsy findings, the

pathologist "suspected the death was not accidental based on the body being placed

between a mattress and box spring and a cigarette butt being placed in the mouth."

*Id*. That is, the pathologist suspected that Davis's death was a homicide.

### C.    *State Court Decision*

The Idaho Court of Appeals held that sufficient evidence supported

McNeil's conviction for voluntary manslaughter:

> [T]he evidence produced at trial revealed it was unlikely
> that Davis' death was accidental and demonstrated that
> McNeil was closely linked to her death. McNeil and
> Davis had a history of violence and domestic disputes;
> indeed, McNeil had pending domestic violence charges
> in Montana as a result of physically and verbally abusing
> Davis. Evidence also revealed that McNeil went to Boise
> in violation of a court order, in the hopes that his
> presence would result in Davis' favorable testimony at
> his trial. Thereafter, McNeil engaged in several more
> arguments with Davis prior to her death and he formed a
> plan to return to Montana with Davis' vehicle and
> antique ring.
>
> Testimony also established that McNeil and Davis
> engaged in an argument the morning of her death,
> wherein loud noises, "like bang bang, and then bang,
> bang," were heard, following which the argument
> subsided. Further, when the brother left for work, McNeil
> was alone in the house with Davis while she allegedly
> slept. At some point Davis died, and instead of calling
> 911, McNeil staged a scene to make it appear that her
> death was caused by a house fire ignited by her act of
> smoking a cigarette in bed. Specifically, her body was
> placed in between the mattress and box spring, a cold
> cigarette butt was placed in her mouth, and electrical

items were placed around the bed. Thereafter, McNeil
removed Davis' two dogs and stole her vehicle, which
was packed with her personal belongings. McNeil then
fled Idaho and drove to Montana where he dropped the
dogs at a kennel and convinced Pluard to pawn Davis'
antique ring. Subsequently, McNeil purchased a bus
ticket to Seattle where he was later arrested.

*Id*. at 54.

The Idaho Court of Appeals concluded that "substantial and competent

evidence support[ed] the jury's conclusion that McNeil caused Davis' death":

McNeil had the opportunity to kill [Davis] while she was
in a vulnerable and helpless state. McNeil and Davis had
a lengthy history of violence and they actually engaged in
a physical and verbal altercation that very morning.
McNeil thereafter went to great lengths to conceal the
circumstances surrounding her death rather than calling
911 or reporting the death to authorities.... [A]lthough
the evidence presented may have been susceptible to
reasonable inferences of both guilt and innocence, the
jury had the ability to decide what inferences to draw.

*Id*.

In sum, the jury "could have found, beyond a reasonable doubt, that McNeil

caused Davis' death by suffocating her or by compressing her chest during or after

the argument and then staged a fire to conceal the relevant circumstances of her

death." *Id*. at 54–55.

### D.    The State Court's Rejection of Claim A(1) Was Not Unreasonable under AEDPA

The Idaho Court of Appeals' decision that sufficient evidence supported the manslaughter conviction was not contrary to, or an unreasonable application of, clearly established federal law. The court of appeals cited state law precedent consistent with the standards of law set forth in *Jackson v. Virginia*, 443 U.S. 307, and reasonably applied those standards in rejecting Claim A(1). This precludes relief under § 2254(d)(1).

However, McNeil argues that he is entitled to relief under § 2254(d)(2), claiming the state court made an unreasonable finding of fact. As he did at trial, McNeil contends here that the victim's body was not actually between the mattress and box spring but, instead, was on top of the mattress. On the contrary, the state court's finding that the victim's body was positioned between the mattress and box spring is supported by ample trial evidence.

A firefighter who responded to the fire testified that Davis's body was found between the box spring and the mattress. Captain James Rabbitt stated that, before discovering the body under the mattress, he had "checked the mattress to make sure the fire was out on the mattress, which included a thermal imager," and that he had patted the mattress down. *State's Lodging A-2* at 280. No body was found during this initial search. Rabbitt lifted the mattress off the box spring; when he did, Rabbitt did not hear anything, such as a body falling onto the box spring.

MEMORANDUM DECISION AND ORDER - 21

Rabbitt also stated that the mattress was lighter than other mattresses he had lifted before, suggesting that Davis's body was not on top of it. *Id*. at 281–85.

Firefighter John Suter testified that, when he helped Rabbitt move the mattress out of the room after Rabbitt started to move the mattress, Suter "did not see a body." *Id*. at 327. Suter stated that he inspected the mattress, both visually and by touch, and did not find "a body or blankets or anything else on that mattress." *Id*. at 326.

In addition to this evidence that the body was not on top of the mattress, fire investigator Thomas Nelson Gainor testified that soot staining on the box spring lined up with the position of Davis's body. This fact showed "that the body was on top of the box spring, and the mattress that was removed was on top of the body before it was taken out." *Id*. at 839–40.

McNeil has not adequately rebutted the presumption of correctness that this Court must apply to the finding regarding the positioning of Davis's body. *See* 28 U.S.C. § 2254(e)(1). McNeil has requested that he be permitted to rely on new evidence not admitted in state court. He claims that one of the firefighters, John Suter, gave an interview in which he said he thought the body was on top of the mattress and that the other firefighter, James Rabbitt, missed Natalie's body in the initial search and then flipped the body onto the box spring while removing the mattress.

This Court previously denied McNeil's motion to expand the record with a recording of this interview, noting, among other things, that the recording was not admitted in state court. *See* Dkt. 62 (relying on *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011)).[2] McNeil has not met any exception that would permit this Court to consider the evidence here.[3]

In any event, the alleged interview contents do not counter the fact that soot staining on the box spring lined up with Davis's body. It is not possible for Davis's body to have been dropped onto the box spring *and* also for there to be a soot stain on the box spring showing the outline of her body. That point was supported at trial by competent evidence, and McNeil had ample opportunity to contest it. Thus, even if the Court considered the new evidence, it would not adequately rebut the Idaho Court of Appeals' finding of fact or change the outcome of this claim.

---

[2] McNeil now asks that the Court reconsider that denial. *See* Dkt. 63. However, because McNeil has not shown clear error or manifest injustice, the Motion for Reconsideration will be denied. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) ("A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loath to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice.") (internal quotation marks omitted).

[3] If a petitioner desires to bring new evidence on federal habeas review that has not been presented to the state courts, and he failed to develop the factual basis of the claims in state court because of "lack of diligence or some greater fault, attributable to" him or his counsel, then he must meet the requirements of § 2254(e)(2). *Williams v. Taylor*, 529 U.S. 420, 432 (2000). If he is not at fault for failing to present the evidence to the state courts, he can present the evidence on federal habeas corpus review without meeting the requirements of § 2254(e)(2). *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004).

MEMORANDUM DECISION AND ORDER - 23

McNeil has not otherwise shown the conviction is based on insufficient evidence. The pathologist pointed out that placement of the body between the box spring and mattress was highly suspicious of intentional homicide given that it is not a natural place for a person to lie down of their own volition. McNeil had abused Davis throughout their relationship and was about to stand trial for such abuse in Montana. McNeil was the last person with Davis before she died, and McNeil took Davis's dogs and her car—filled with her belongings—to Montana after Davis's death. He had a friend pawn the victim's ring.

Given this evidence, a rational juror certainly could have concluded that McNeil caused Davis's death by one of the ways described by the pathologist as supported by the autopsy. That a rational juror also could have concluded that McNeil did not cause Davis's death does not render the conviction invalid. *See Jackson*, 443 U.S. at 319 ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

For these reasons, the Court concludes the Idaho Court of Appeals reasonably held that sufficient evidence supports McNeil's manslaughter conviction. Thus, Claim A(1) must be denied.

**4.      McNeil Is Not Entitled to Habeas Relief on His Remaining Ineffective Assistance Claims: Claims B(9), B(10), and B(11)**

The remaining portions of Claim B assert that McNeil's trial counsel rendered ineffective assistance in violation of the Sixth Amendment.

### A.      *Clearly Established Law*

The Sixth Amendment to the United States Constitution provides that a criminal defendant has a right to the effective assistance of counsel in his defense. The Supreme Court explained the standard for ineffective assistance claims in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner asserting ineffective assistance of counsel ("IAC") must show that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) those errors prejudiced the defendant by "depriv[ing] the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. A petitioner must establish both deficient performance and prejudice to prove an IAC claim. *Id.* at 697. On habeas review, a court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one prong is not satisfied and would compel denial of the IAC claim. *Id.*

Whether an attorney's performance was deficient is judged against an objective standard of reasonableness.  *Id.* at 687–88. A reviewing court's inquiry into the reasonableness of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of a defense, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Id.* at 690. Moreover, an attorney who decides not to investigate a potential defense theory is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

MEMORANDUM DECISION AND ORDER - 26

> unnecessary. In any ineffectiveness case, a particular
> decision not to investigate must be directly assessed for
> reasonableness in all the circumstances, applying a heavy
> measure of deference to counsel's judgments.

*Id.* at 690–91. That is, "the duty to investigate does not force defense lawyers to
scour the globe on the off chance something will turn up; reasonably diligent
counsel may draw a line when they have good reason to think further investigation
would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

The Ninth Circuit has provided some insight into the *Strickland* standard
when evaluating an attorney's "strategy calls." These cases are instructive in the
Court's assessment of whether the state court reasonably applied *Strickland*. *See
Duhaime*, 200 F.3d at 600. Tactical decisions do not constitute IAC simply
because, in retrospect, better tactics are known to have been available. *Bashor v.
Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). And a mere difference of opinion as
to tactics does not render counsel's assistance ineffective. *United States v. Mayo*,
646 F.2d 369, 375 (9th Cir. 1981).

If a petitioner shows that counsel's performance was deficient, he must then
show that the deficient performance caused prejudice. "An error by counsel, even
if professionally unreasonable, does not warrant setting aside the judgment of a
criminal proceeding if the error had no effect on the judgment." *Strickland*, 466
U.S. at 691. To satisfy the prejudice standard, a petitioner "must show that there is
a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." *Id*. at 694. As the *Strickland* Court

instructed:

> In making this determination, a court hearing an
> ineffectiveness claim must consider the totality of the
> evidence before the judge or jury. Some of the factual
> findings will have been unaffected by the errors, and
> factual findings that were affected will have been
> affected in different ways. Some errors will have had a
> pervasive effect on the inferences to be drawn from the
> evidence, altering the entire evidentiary picture, and
> some will have had an isolated, trivial effect. Moreover, a
> verdict or conclusion only weakly supported by the
> record is more likely to have been affected by errors than
> one with overwhelming record support. Taking the
> unaffected findings as a given, and taking due account of
> the effect of the errors on the remaining findings, a court
> making the prejudice inquiry must ask if the defendant
> has met the burden of showing that the decision reached
> would reasonably likely have been different absent the
> errors.

*Id.* at 695–96. Similarly, if an IAC claim is based on counsel's failure to file

a motion, the petitioner must establish a reasonable likelihood that, had counsel

filed the motion in question, such a motion would have been granted. To constitute

*Strickland* prejudice, "[t]he likelihood of a different result must be substantial, not

just conceivable." *Richter*, 562 U.S. at 112.

The foregoing standard, giving deference to counsel's decision-making, is

the de novo standard of review. Another layer of deference—to the state court

decision—is afforded under AEDPA. In giving guidance to federal courts

reviewing *Strickland* claims on habeas corpus review, the United States Supreme

Court has explained:

> The pivotal question is whether the state court's
> application of the *Strickland* standard was unreasonable.
> This is different from asking whether defense counsel's
> performance fell below *Strickland*'s standard. Were that
> the inquiry, the analysis would be no different than if, for
> example, this Court were adjudicating a *Strickland* claim
> on direct review of a criminal conviction in a United
> States district court. Under AEDPA, though, it is a
> necessary premise that the two questions are different.
> For purposes of § 2254(d)(1), "an unreasonable
> application of federal law is different from an incorrect
> application of federal law." *Williams*, *supra*, at 410, 120
> S. Ct. 1495. A state court must be granted a deference
> and latitude that are not in operation when the case
> involves review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101.

Because *Strickland* itself "is a general standard, a state court has even more

latitude to reasonably determine that a defendant has not satisfied that standard."

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Indeed, "the more general the

rule, the more leeway state courts have" in deciding constitutional claims. *Shinn v.

Kayer*, 141 S. Ct. 517, 523 (2020) (per curiam) (internal quotation marks omitted).

That is, when evaluating an IAC claim under § 2254(d), this Court's review of that

claim must be "doubly deferential." *Pinholster*, 563 U.S. at 190 (internal quotation

marks omitted).

**B.**     ***The State Court's Rejection of Claim B(9) Was Not Unreasonable under AEDPA***

Claim B(9) asserts counsel should have moved for a mistrial after a juror saw McNeil in the back of a police car. Underlying the *Strickland* IAC standard is the standard of law governing the asserted error, which the Court also must consider. Under Idaho state law, a mistrial may be granted in a situation like McNeil's if the defendant shows actual prejudice from the juror's seeing the defendant in the patrol car.[4] *State's Lodging F-6* at 7–8. The Idaho Court of Appeals noted that "actual prejudice" in this context—the standard for granting a mistrial motion under state law—is different from the "reasonable possibility of prejudice" required to prove an IAC claim under *Strickland*. The court concluded that any mistrial motion would have been denied because McNeil had not shown actual prejudice. Thus, because a hypothetical motion for mistrial would have been denied, McNeil could not establish a reasonable probability of prejudice under *Strickland*.

This was a reasonable application of Supreme Court precedent. The state court correctly noted that to prevail on an IAC claim in this situation requires a

---

[4] Because the Idaho courts had not considered a case where a juror saw a defendant in a patrol car, the state court analogized the situation to one in which a juror sees a defendant in jail clothing. *See State's Lodging F-6* at 8 and n.1 (relying on *Bias v. State*, 365 P.3d 1050 (Idaho Ct. App. 2015). The court assumed, without deciding, that the two situations were comparable and applied state precedent relating to jail clothing.

petitioner to show a reasonable probability that the trial court would have granted a

motion for a mistrial. Because McNeil had not shown actual prejudice, which is

required for a mistrial under Idaho state law, the court reasonably held that he also

had not shown *Strickland* prejudice. As a result, AEDPA precludes relief on Claim

B(9).

### C.    *The State Court's Rejection of Claim B(10) Was Not Unreasonable under AEDPA*

Claim B(10) asserts counsel should have moved for a mistrial after a juror

was seen speaking to the victim's uncle. Citing Supreme Court and Ninth Circuit

authority, the state court noted that due process would not be violated based on a

"chance contact" between a juror and a witness, but it would be violated if the

individuals concerned communicated "*about the matter pending before the jury*."

*State's Lodging F-6* at 11–12 (relying on *Remmer v. United States*, 347 U.S. 227

(1954), and *Godoy v. Spearman*, 861 F.3d 956 (9th Cir. 2017) (en banc)). Because

McNeil had alleged only that he saw a juror "speaking to a man whom … had

earlier [been] identified as the [victim's] uncle," there was no evidence that the

communication had anything to do with the case against McNeil or was anything

other than a chance encounter. *Id*. at 12 (alteration in original). Thus, McNeil had

not shown "a credible risk" that the communication "affected the jury's guilty

verdict." *Id*.

This was also a reasonable application of *Strickland*. The state court correctly cited and explained the relevant case law regarding juror communication. There was no evidence that the juror and the victim's uncle were speaking about the case—or about anything in particular, for that matter. Therefore, any mistrial motion would have been denied, and McNeil has not shown *Strickland* prejudice. McNeil is not entitled to relief on Claim B(10).

### D. The State Court's Rejection of Claim B(11) Was Not Unreasonable under AEDPA

Claim B(11) asserts counsel should have investigated, as a defense to the grand theft charge, McNeil's assertion that Davis had previously tried to pawn her antique ring—the ring McNeil gave to Pluard to sell for him after Davis's death. According to the pawn store policy, the video would have been kept for 45 days after Davis had attempted to sell the ring, but the video would have been destroyed when McNeil's counsel did not request it from the store within that 45-day time period.

As the state court noted, McNeil alleged only that a pawn shop's surveillance video "*may have* shown [the victim] attempting to pawn her ring," which "*may have* rebutted the inference" that "the victim was reluctant to part with her ring." *State's Lodging F-6* at 5 (internal quotation marks omitted) (emphasis added) (alteration in original). The Idaho Court of Appeals found these statements insufficient to establish a reasonable likelihood that the video—whatever it might

have shown—would have led to a difference in the trial outcome. *Id*. at 6–7.

Further, the court of appeals observed, a mere allegation that "counsel potentially

failed to discover a possible weakness in the State's case is not deficient

performance." *Id*. at 7. As a result, the claim failed on the first *Strickland* prong as

well.

Once again, this Court concludes that the Idaho Court of Appeals reasonably

rejected Claim B(11). Even assuming that the video—if investigated—would have

shown Davis attempting to pawn her ring before her death, such behavior has no

bearing on whether McNeil later stole the ring. It is irrelevant to the grand theft

charge. Therefore, McNeil cannot show a reasonable possibility that the video

would have resulted in an acquittal on the grand theft charge, which means he has

not shown prejudice or deficient performance for counsel's failure to obtain an

irrelevant video clip. Thus, the state court's *Strickland* decision was reasonable

under AEDPA.

## 5.   McNeil Is Not Entitled to Habeas Relief on the Remaining Portions of McNeil's Prosecutorial Misconduct Claims: Claims C(1), C(2), and C(3)

The remaining portions of Claim C assert prosecutorial misconduct during

the prosecutor's closing and rebuttal closing arguments.

### A.   *Clearly Established Law*

The Due Process Clause guarantees the right to a fair trial, and prosecutors

have a "duty to refrain from improper methods calculated to produce a wrongful

MEMORANDUM DECISION AND ORDER - 33

conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). However, such

methods will warrant habeas relief only if they "'so infected the trial with

unfairness as to make the resulting conviction a denial of due process.'" *Darden v.*

*Wainwright*, 477 U.S. 168, 180 (1986) (quoting *Donnelly v. DeChristoforo*, 416

U.S. 637, 643 (1974)).

A court must consider the record as a whole when making such a

determination, because a prosecutor's inappropriate or erroneous comments or

conduct may not be sufficient to undermine the fairness of the proceedings when

viewed in context. *United States v. Young*, 470 U.S. 1, 16–17 (1985); *Darden*, 477

U.S. at 182 (applying *Young*); *see also Donnelly*, 416 U.S. at 647–48

(distinguishing between "ordinary trial error of a prosecutor" and the type of

"egregious misconduct … [that] amount[s] to the denial of constitutional due

process"). The "touchstone of due process analysis in cases of alleged

prosecutorial misconduct is the fairness of the trial, not the culpability of the

prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

A prosecutor "should not use arguments calculated to inflame the passions

or prejudices of the jury." *Darden*, 477 U.S. at 192 (internal quotation marks

omitted). However, a closing argument, "billed in advance to the jury as a matter

of opinion not of evidence," is "seldom carefully constructed" and may contain

"[i]solated passages" that are "less than crystal clear." *Donnelly*, 416 U.S. at 646–

47. Therefore, both prosecutors and defense attorneys must be given "wide latitude" in closing argument. *United States v. Wilkes*, 662 F.3d 524, 538 (9th Cir. 2011).

Prosecutors are allowed "to strike hard blows based on the evidence presented and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996). For example, "in a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying." *United States v. Alcantara-Castillo*, 788 F.3d 1186, 1194 (9th Cir. 2015) (internal quotation marks and alterations omitted).

A court must not "lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly*, 416 U.S. at 647. Therefore, a prosecutor's argument "must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's [improper argument] would have on the jury's ability to judge the evidence fairly." *Young*, 470 U.S. at 12.

When a challenged comment by the prosecutor is made in rebuttal closing argument, "the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." *Id*. If

the challenged comments "were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments [do] not warrant reversing [the] conviction." *Id*. at 12–13.

Some of McNeil's prosecutorial misconduct claims also implicate the Fifth Amendment, which guarantees freedom from compelled self-incrimination. Every criminal defendant has a right not to testify, and the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 616 (1965).

Not every comment relating to the right not to testify violates the Fifth Amendment, however. The Fifth Amendment is "concerned only with *adverse* comment, whether by the prosecutor or the trial judge"; neutral comments, such as an instruction by the court that the jury may not infer guilt from a defendant's silence, do not offend the Constitution. *Lakeside v. Oregon*, 435 U.S. 333, 338 (1978). Further, a prosecutor's comments on a defendant's choice not to testify will not violate the Fifth Amendment if those comments constitute fair argument offered in response to a defense claim that the defendant did not have a chance to tell his side of the story. *United States v. Robinson*, 485 U.S. 25, 31–32 (1988).

For example, in *Robinson*, the defendant did not testify at trial. During closing argument, defense counsel argued that the government had breached its

"duty to be fair" and had not allowed the defendant to explain himself. *Id.* at 27

n.2. The prosecutor then told the jury, "[Defense counsel] has made comments to

the extent the Government has not allowed the defendant[] an opportunity to

explain. It is totally unacceptable…. He could have taken the stand and explained it

to you, anything he wanted to. The United States of America has given him,

throughout, the opportunity to explain." *Id.* at 28. The Supreme Court held that the

prosecutor's statements, taken in the context in which they were made, did not

violate the defendant's Fifth Amendment right to be free from compelled self-

incrimination. *Id.* at 31. The Court determined that the Fifth Amendment does not

"prohibit [a] prosecutor from fairly responding to an argument of the defendant by

adverting to [the accused's] silence." *Id.* at 34; *see also Darden*, 477 U.S. at 179

(stating that, when a prosecutor's allegedly improper comments occur in a rebuttal

closing, those comments "must be evaluated in light of the defense argument that

preceded [them].").

Moreover, the rule against commenting on a defendant's failure to testify

generally does not prohibit a prosecutor from pointing out to the jury that a piece

of evidence is uncontroverted. *See Lockett v. Ohio*, 438 U.S. 586, 595 (1978)

(holding that prosecutor did not violate the Constitution by stating that evidence

was "unrefuted" and "uncontradicted," where counsel for non-testifying defendant

told the jury defendant would testify). A prosecutor's "reference to uncontradicted

portions of the Government's evidence is improper *only* when the statement will naturally and necessarily be construed by the jury to be an allusion to the defendant's failure to testify." *United States v. Hasting*, 461 U.S. 499, 515 (1983) (emphasis added). *See also United States v. Mende*, 43 F.3d 1298, 1301 (9th Cir. 1995) ("There is a distinction between a comment on the defense's failure to present exculpatory evidence as opposed to a comment on the defendant's failure to testify. This Court has recognized that a prosecutor may properly comment upon the defendant's failure to present exculpatory evidence, as long as it is not phrased to call attention to defendant's own failure to testify.").

When reviewing prosecutorial misconduct claims under the "unreasonable application" prong of § 2254(d)(1), the Court must keep in mind that the due process standard is a "very general one" that affords state courts substantial "leeway in reaching outcomes in case-by-case determinations." *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam) (internal quotation marks and alterations omitted).

### B.     *The State Court's Rejection of Claim C(1) Was Not Unreasonable under AEDPA*

In the remaining portions of Claim C(1), McNeil asserts that the prosecutor twice improperly commented on his failure to testify. The first challenge is to the following remark by the prosecutor:

MEMORANDUM DECISION AND ORDER - 38

> He put that body between the mattress and the box
> spring. We know that's a staged scene. You know that's
> a staged scene. *There has been no testimony other than
> that.*

*State's Lodging B-1* at 17.

The Idaho Court of Appeals concluded that this statement was proper because it did not imply "that McNeil was obligated to take the witness stand in order to avoid an inference of guilt." *McNeil*, 313 P.3d at 57. The prosecutor was referring to the evidence that the fire was staged, and there was no contrary evidence presented by McNeil: "Defense counsel had the opportunity to call witnesses other than the defendant, such as an expert witness in fire investigation, to contradict evidence regarding how the fire started." *Id*. That is, the prosecutor's language did not naturally and necessarily imply that McNeil himself could or should have testified. The state court of appeals thus held it was permissible for the prosecutor to state that the evidence of staging was uncontroverted.

This was a reasonable application of *Lockett* and *Hasting*. The prosecutor simply pointed out the lack of evidence calling into question investigators' conclusion that the fire was staged. McNeil was not the only witness who could have testified about the crime scene, and the prosecutor's comment contained no reference, either express or implied, to McNeil's choice not to testify.

The prosecutor's second challenged comment was the following:

> "And, of course, we know she was dead before the fire,
> so the fire didn't kill her, and she had been dead some
> time before the fire because the lividity had set in, *so
> there is a small window there nobody can really know
> except the defendant. He's the only person who lived
> through it*.

*State's Lodging B-1* at 17.

As to this statement, the Idaho Court of Appeals declined to decide whether

it was improper. Instead, the court held that any violation, if it occurred, was

harmless. The appellate court pointed out that the statement was made when the

prosecutor was discussing the malice element of second-degree murder—the

charge for which McNeil was acquitted:

> The prosecutor essentially said that McNeil acted with
> malice before Davis' death as demonstrated by their
> argument in the morning, and McNeil acted with malice
> after Davis' death as demonstrated by his theft of Davis'
> belongings and vehicle. The prosecutor then argued that,
> though McNeil was the only person present, McNeil
> must have had malice during the event that caused Davis'
> death because it would be unreasonable to have malice,
> then have a brief period of no malice, and then have the
> malice resume again. However, the jury rejected this
> argument and determined, by virtue of its verdict, that
> McNeil acted without malice and accordingly acquitted
> him of second degree murder.

*McNeil*, 313 P.3d at 57. Because the jury rejected the prosecutor's malice

argument, McNeil could not show that the prosecutor's statement prejudiced him.

This was a reasonable application of Supreme Court precedent. The

prosecutor was, indeed, discussing the malice element of second-degree murder

MEMORANDUM DECISION AND ORDER - 40

when making the "small window" comment. Immediately after stating that no one

could know what happened except McNeil because McNeil lived through it, the

prosecutor went on:

> But, you know, there was an expression of malice
> in there. It's on both sides of the act, and it's a small little
> narrow band in the act; why would you think that he went
> from malice to no malice while he killed her, and then
> expressing residual malice after-the-fact? Of course, this
> is a malicious killing.

*State's Lodging A-2* at 1081.

Because the jury acquitted McNeil of second-degree murder, the jurors

obviously *rejected* this argument by the prosecutor. Thus, McNeil cannot establish

that, absent the allegedly improper statement, the outcome of the trial would have

been different. The state court's harmlessness determination was not unreasonable,

*see* 28 U.S.C. § 2254(d), and McNeil has not shown prejudice under *Brecht*.

For these reasons, the remaining portions of Claim C(1) must be denied.

### C.    *The State Court's Rejection of Claim C(2) Was Not Unreasonable under AEDPA*

In Claim C(2), McNeil alleges that the prosecutor appealed to the passions

and prejudices of the jury. He challenges the following statements:

> (a) "She [Davis] was a helpless victim, helpless adult,
> like a baby. She drank too much, probably, had too
> many sleeping pills, was trying to get to Monday to
> get out of town. But she was in no condition to fight
> back, so it made it easy for the defendant."

(b) "And that just because she was vulnerable and an easy target, it's no reason to let him get away with murder."

(c) "Mark Twain once commented that every person is born to one possession that out-values all the rest at his last breath, and that's what the defendant stole from Natalie Davis in this case. He stole her last breath, her most valuable possession. What do we know about some of the last breaths she had? Some were spent telling him to get out. Some were spent calling the police on him. Fibbing, but calling.[5] Some were spent calling the Montana authorities. And defendant couldn't have that. That's no way of spending your last breath."

*State's Lodging A-2* at 1079, 1101–02 (emphasis added); *see* Dkt. 14 at 34–35.

The Idaho Court of Appeals held that the prosecutor's comments "were made in direct rebuttal to defense counsel's argument" or "were otherwise comments regarding admissible evidence." *McNeil*, 313 P.3d at 57. This was a reasonable application of Supreme Court precedent.

The first challenged comment—the "helpless victim" or "baby" comment—occurred in closing argument when the prosecutor was discussing the elements of the offense. Specifically, the prosecutor argued the state had proven that McNeil

---

[5] The "fibbing" comment referred to a phone call Davis had made to police the night before the fire. In that call, Davis reported a domestic disturbance, but falsely provided the name of the suspect. She said the suspect's name was "Michael" McNeil, instead of his true name of Lloyd Hardin McNeil. *State's Lodging A-2* at 678, 696–99.

MEMORANDUM DECISION AND ORDER - 42

caused Davis's death "without justification or excuse." *State's Lodging A-2* at

1079.

This comment was plainly supported by the trial evidence. Dr. Garrison, the

pathologist, testified that Davis could have been asphyxiated while she was

incapacitated—an intentional death. This conclusion was based on the lack of

petechial hemorrhaging in Davis's eyes. Such hemorrhaging, said Garrison, would

have been present if Davis was fighting back:

> You can suffocate someone with a pillow, simply
> if they are incapacitated. *If it's an adult and they can't
> fight back, then they will die. If it's a baby, they can't
> fight back in any event, so you don't see anything.*
>
> *The adult, if they are capable of fighting back, can
> and will. If they are not and they are incapacitated, then
> your findings are nothing. You don't see anything unless
> you've got some element of injury, and most of the time
> you don't.*

*Id*. at 585 (emphasis added). In addition to this evidence that Davis was

incapacitated at the time of her death, there was also evidence that she had alcohol

and Benadryl in her system—enough to incapacitate her, but not enough to kill her.

*Id*. at 533.

The evidence supported the prosecutor's argument that McNeil did not act

with any justification or excuse when he caused Davis's death. This was a fair

comment on the evidence presented at trial and did not constitute prosecutorial

misconduct.

MEMORANDUM DECISION AND ORDER - 43

The second challenged comment—that just because Davis was vulnerable was no reason to let McNeil get away with murder—was made in rebuttal closing. Defense counsel had argued in closing that Davis died accidentally and that Dr. Garrison's testimony did not support a finding of intentional asphyxiation:

> So it's been nearly a year since [Davis's] body was found, March 5, 2011. Almost a year, and we have been through a fairly long trial now. You have heard a lot of evidence, and we are near the end, and we still have no idea how Natalie Davis died.
>
> Cause and manner of death, unknown and undetermined. So we come up with a theory, and that theory is suffocation. Wasn't anything else. So it had to have been suffocation.
>
> And so we went through with Dr. Garrison, the State's own witness, about the common and major contributors or indications of suffocation, petechia in the eyes. Not present in this case. Marks on the neck, nothing significant. Bruising on the muscles in the neck revealed through autopsy. Nope. Broken bones in the throat, those little hyoid bones down through the larynx, none of those either.
>
> But that's their theory anyway, suffocation. We talked to Dr. Garrison about this concept of positional asphyxia, and he indicated—you heard him, State's own witness says this theory of suffocation was unproven.
>
> And this idea of positional asphyxia, someone in a weakened or compromised position, putting themselves in an oxygen-deprived situation, and either not realizing they are in an oxygen-deprived situation or not being able to remove themselves from that situation, or both, ultimately leads to that person essentially suffocating themselves.

>        You heard the State's own witness, Dr. Garrison,
> say "It's a possibility." Unproven, like suffocation, but a
> possibility in this case.

*State's Lodging A-2* at 1083–84.

The prosecutor's "helpless victim" comment was supported by the trial evidence and was a fair response to defense counsel's argument that there was no evidence of an intentional homicide. *See Young*, 470 U.S. at 12–13. Dr. Garrison had testified that Davis's death could have been accidental or intentional and that the autopsy supported either finding. By commenting on Davis's vulnerability, the prosecutor was simply reminding the jury that the death could have been intentionally caused and yet still not have resulted in any visible injury. Indeed, that precise result would have occurred if McNeil suffocated Davis while she was unconscious or otherwise incapacitated. This comment by the prosecutor was not improper.

The third comment—about the way Davis spent her last breaths—was a reasonable inference that could be drawn from the evidence presented at trial. During events leading up to Davis's death, she argued with McNeil and called the police. That the prosecutor framed these events within a more poignant rhetoric, arguing that she spent her "last breaths" in those ways, does not transform them into violations of due process.

None of the prosecutor's comments transgressed clearly established United States Supreme Court precedent governing prosecutorial misconduct claims. For these reasons, the Idaho Court of Appeals' rejection of Claim C(2) was not unreasonable under § 2254(d), and McNeil is not entitled to relief on this claim.

### D.     The State Court's Rejection of Claim C(3) Was Not Unreasonable under AEDPA

In the remaining portions of Claim C(3), McNeil asserts that two other comments by the prosecutor during rebuttal closing were improper.

Defense counsel finished closing argument by arguing that the evidence did not support a conviction for murder or arson:

> Have they proven to you that [McNeil] is guilty beyond a reasonable doubt of murder and arson? No, they have not. You should find him not guilty. Thank you.

*State's Lodging A-2* at 1095. The very first statement made by the prosecutor in rebuttal closing was, "I guess they concede the grand theft." *Id*. Plaintiff challenges this comment as a misrepresentation.

In closing argument, defense counsel had also argued that the theory about Davis's body being positioned between the mattress and box spring was "deeply, deeply[] flawed." *State's Lodging A-2* at 1086. Despite the flawed theory, counsel argued, the prosecution had to "stick to that theory because it's how they get homicide." *Id*.

In rebuttal closing, the prosecutor stated:

MEMORANDUM DECISION AND ORDER - 46

> "We want to hold people accountable when they
> murder someone, yes, but we don't want it to happen.
> We don't want to make it up. *And he [defense
> counsel] has to say that to try to get his client out of
> trouble*."

*State's Lodging A-2* at 1098. McNeil argues that this statement denigrated defense

counsel.

The Idaho Court of Appeals rejected the claim that either of these comments

constituted prosecutorial misconduct. The court reasoned that the statements were

made as direct rebuttal to defense counsel's closing argument. *McNeil*, 313 P.3d at

57.

This was not an unreasonable application of Supreme Court precedent, nor

was it based on an unreasonable finding of fact. In closing, McNeil's counsel did

admit to facts that supported a conviction for grand theft:

> The State presented you with a lot of information about
> [McNeil]. He had a case pending in Montana against
> Natalie. *He was leaving town in this Suzuki Vitara. It was
> full of Natalie's things. He had her dogs*. He dropped
> them off at a dog shelter, gave a false name, *used
> Amanda to pawn the ring*."

*State's Lodging A-2* at 1093. These facts could have—and did—convince the jury

that McNeil was guilty of grand theft, and the prosecutor did not commit

misconduct in rebuttal closing by pointing out defense counsel's lack of argument

on grand theft.

MEMORANDUM DECISION AND ORDER - 47

The "he has to say that" comment also does not rise to the level of prosecutorial misconduct but was of the same nature as the comments that triggered the rebuttal. Defense counsel had argued that the State had to "stick with" the theory that the body was under the mattress because it was "how they get homicide." This implied that the prosecution's theory of the case was manufactured in order to convict McNeil. The prosecutor's response—that the government does not want to make things up in order to convict people—was proper rebuttal. As explained in *Young*, when evaluating rebuttal comments, "the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." 470 U.S. at 12. Here, the prosecutor's challenged comments "were 'invited,' and did no more than respond substantially in order to 'right the scale.'" *Id*. at 12–13.

It might have been best practice to refrain from saying that defense counsel "has to say" the State manufactured its theory of the crime, but that comment does not violate due process. Attorneys are afforded wide latitude in closing argument, and the Idaho Court of Appeals' conclusion that the comment was not improper is not unreasonable under AEDPA.

Further, even if the Court assumes for the sake of argument that this last comment did constitute prosecutorial misconduct, McNeil still has not shown that he is entitled to habeas corpus relief. He has not established that the comment

actually prejudiced him as required by *Brecht*. McNeil simply cannot show that— had the prosecutor refrained from using the "defense counsel has to say that" comment to rebut counsel's implication that the prosecution fabricated the evidence that the body was lying on the top mattress—the jury would have instead believed McNeil's theory that the body was on top of the mattress and was later flipped onto the box spring by the firefighters. Jurors are instructed that attorney comments are only that—argument. The comment certainly did not sufficiently infect the trial so as to make it fundamentally unfair. *See Donnelly*, 416 U.S. at 643. Therefore, McNeil is not entitled to relief on Claim C(3).

## CONCLUSION

For the foregoing reasons, Claims A(2), A(3), as well as portions of Claims C(1) and C(3), must be dismissed as procedurally defaulted without excuse, and all remaining claims must be denied on the merits. Accordingly, this case will be dismissed with prejudice in its entirety.

## ORDER

**IT IS ORDERED:**

1.   McNeil's Motion for Reconsideration (Dkt. 63) is DENIED.

2.   The Petition for Writ of Habeas Corpus (Dkt. 3) is DISMISSED IN PART and DENIED IN PART, and this entire action is DISMISSED with prejudice.

3.      The Court does not find its resolution of this habeas matter to be

reasonably debatable, and a certificate of appealability will not issue.

*See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section

2254 Cases. If McNeil wishes to appeal, he must file a timely notice

of appeal with the Clerk of Court. McNeil may seek a certificate of

appealability from the Ninth Circuit by filing a request in that court.


DATED: August 1, 2023

_____

B. Lynn Winmill
U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 50